IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ALMA H. & LIBERTY H.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ALMA H. & LIBERTY H., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NICHOLAS H., APPELLANT.


Filed June 28, 2022.    No. A-21-976.


Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Reilly M. White for appellant.

David Ceraso, Deputy Douglas County Attorney, and Zachary Severson, Senior Certified Law Student, for appellee.


PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Nicholas H. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his daughters, Alma H. and Liberty H. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Nicholas is the biological father of Alma, born in 2017, and Liberty, born in 2018. Royeisha H. is the girls' biological mother. The juvenile court terminated Royeisha's parental rights to Alma

and Liberty during these same juvenile proceedings. Because Royeisha is not part of this appeal, she will only be discussed as necessary.

Alma and Liberty were removed from the parental home in December 2019, because of concerns regarding domestic violence between their parents, the parents' failure to follow a protection order and safety plan, Nicholas' untreated mental health conditions, and improper supervision of the children.

The State filed an initial and supplemental petition on December 18, 2019. The supplemental petition alleged that Alma and Liberty fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State alleged: Nicholas had mental health needs that he failed to address; Nicholas engaged in and subjected Royeisha to domestic violence; Nicholas failed to provide proper parental care, support, and/or supervision for the children; and for the above reasons, the children were at risk for harm. The State also filed a motion for the immediate temporary custody of Alma and Liberty to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. Alma and Liberty have since remained in the custody of DHHS and in foster care.

Following a continued protective custody hearing on December 31, 2019, Nicholas was "invited" to undergo chemical dependency, psychiatric, and psychological evaluations; sign releases as requested by DHHS and/or St. Francis; enroll in and successfully complete an accredited domestic violence program which includes foundational classes and batterer's intervention counseling; undergo a parenting assessment; and "[c]omply fully with the terms of the Protection Order." Nicholas was to have supervised visitation "if allowed by the Protection Order." (Emphasis omitted.)

The State filed an amended supplemental petition on February 18, 2020. It alleged that Alma and Liberty fell within § 43-247(3)(a) through "no fault" of Nicholas. In addition to the allegations from the supplemental petition, the State also alleged that Nicholas was "diagnosed with Personality Disorder Not Otherwise Specified-Psychopathic Personality Disorder, Antisocial Personality Disorder, Schizoaffective Disorder, Bipolar Type, Post-Traumatic Stress Disorder, and Caffeine Use Disorder and due to [Nicholas'] mental health instability, his children are at risk for harm."

On February 19, 2020, Alma and Liberty were adjudicated as being within the meaning of § 43-247(3)(a) based on Nicholas' "no contest plea" to the allegations in the amended supplemental petition. The matter proceeded to "partial disposition" and the juvenile court appointed a guardian ad litem for Nicholas over his objection. The juvenile court found:

> [T]here is conflicting information as to whether or not a Protection Order existed between the father and the minor children. Nevertheless, Exhibit 6 depicts the father as hostile, verbally inappropriate, threatening, intimidating, and most likely unmedicated or under medicated. *No visitation will be ordered until this Court has received proof that the father is complying with mental health medication from his treating physician.*

(Emphasis supplied.)

Following a disposition hearing on March 26, 2020, the juvenile court ordered Nicholas to: participate in psychiatric medication management; sign a release of information to St. Francis for his treatment providers at Douglas County Health, "including Dr. Koblish"; participate in and

complete domestic violence education, to include "Batterer's Intervention"; continue to follow the parameters of the protection order; participate in agency supervised visitation once he is released from incarceration and is complying with his mental health treatment; once released from incarceration, make contact with his case manager from St. Francis; and undergo a complete physical with a physician who has been provided a copy of Dr. Kirk Newring's psychological evaluation.

Following a review and permanency planning hearing on June 11, 2020, the juvenile court ordered Nicholas to: participate in psychiatric medication management; sign a release of information to St. Francis for his treatment providers at Douglas County Health, including Dr. Koblish; participate in and complete domestic violence education, to include Batterer's Intervention; continue to follow the parameters of the protection order; and undergo a complete physical with a physician who has been provided a copy of Dr. Newring's psychological evaluation. The court ordered that Nicholas was to have no contact with the children until the protection order was addressed. Following a review and permanency planning hearing on August 20, Nicholas was allowed reasonable rights of agency-supervised visitation, but the court stated that "[v]isits shall be terminated immediately if [Nicholas] displays concerning behaviors," and a visit would be terminated if he discussed the juvenile case with his daughters during the visit. The remainder of Nicholas' court-ordered requirements were the same as they were in the June order.

On February 2, 2021, the State filed a motion to terminate Nicholas' parental rights to Alma and Liberty pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016). The motion alleged as follows: Nicholas substantially and continuously or repeatedly neglected and refused to give the juveniles or a sibling of the juveniles necessary parental care and protection. Reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a). Termination of Nicholas' parental rights was in the best interests of Alma and Liberty.

Following a review hearing on February 2, 2021, the juvenile court suspended visitation between Nicholas and the children "pending further hearing." Following an evidentiary hearing regarding visitation, the court entered an order on February 17 stating that Nicholas would be allowed one visit per month with Alma and Liberty. However, on April 14, the court suspended Nicholas' visitation with the children because Nicholas was currently incarcerated on domestic violence and strangulation charges.

TERMINATION HEARING

A hearing on the motion to terminate Nicholas' parental rights was held over the course of 4 days in August and October 2021. Numerous witnesses testified and several exhibits were received into evidence. Nicholas did not testify in his own behalf. A summary of the relevant evidence follows.

Dawn Morgan-Baker is a case manager with St. Francis Ministries and was assigned to this case in December 2019. Morgan-Baker testified that Alma and Liberty came into care because of domestic violence between their parents and because their mother did not follow the safety plan.

A certified copy of a district court criminal case against Nicholas was received into evidence. As a result of an incident occurring on December 17, 2019, Nicholas was charged with "Assault DV 3rd Degree 2nd Offense," a Class IIIA felony; Royeisha was the named victim. On

April 28, 2020, Nicholas pled guilty to an amended charge of domestic assault 3rd degree, a Class I misdemeanor. He was sentenced to 90 days' imprisonment in the Douglas County Correctional Center, and he was given credit for 45 days' time served.

When Morgan-Baker met Nicholas in December 2019, they discussed voluntary services and what her recommendations were so that he could start services prior to them being court ordered. Eventually Nicholas was court ordered to complete psychiatric and psychological evaluations, complete a physical, do medication management, sign releases of information, complete batterers' intervention, participate in parenting time, and follow the protection order. Morgan-Baker stated, "The only court order he's been compliant with is following the protection order, completing the psychological evaluation, and completing the visits at a 68 percent ratio while they've been allowed by the Court."

Kirk A. B. Newring, a licensed psychologist, conducted a psychological evaluation and risk assessment of Nicholas in January 2020. Nicholas brought his mother and girlfriend to the appointment because he was not a "great historian," and he thought his mother and girlfriend would be able to provide helpful information to Newring. Newring testified that Nicholas' mother provided helpful information regarding Nicholas' background: Nicholas "showed early indications of atypical development that was then identified as a genetic anomaly" and he "had struggles in school as early as kindergarten"; later the mother was faced with the decision to place Nicholas in foster care or lose all of her children--she agreed to have Nicholas "go into the system" for what she understood would be a temporary placement, but it lasted several years. On cross-examination, Newring said that "[f]rom what Nick and his mom described, his experience in the child welfare system . . . [was] [s]omewhere between terrible and horrific"; "He was smaller statured" and "[h]e didn't have the words to defend himself when kids picked on him," "[s]o he was ultimately suicidal as a result of his experience in the child welfare system."

Newring stated that testing used during the evaluation revealed Nicholas "had a relative deficit in verbal comprehension, suggesting that understanding spoken and written language would be a weakness for him relative to nonverbals," his understanding of the written language was "at the elementary school level," and that he "could read words at the sixth grade level . . . but not know what they mean." According to Newring, Nicholas had an "early elementary . . . ability to read, write, and do math." Because "a lot of the psychological testing that is available is generally written at the fourth grade level," Newring concluded that "additional psych testing wouldn't be worth our time"--Newring would not have been able to draw any reasonable inferences if there were unusual or atypical scores.

Newring testified that on the "Hare Psychopathy Checklist-Revised 2nd Edition," Nicholas showed "more of the features that tend to go along with exploitative interactions, having a hot temper, getting in trouble, and failing to benefit from consequences." And on the "Violence Risk Appraisal Guide-Revised," Nicholas "showed many of the actuarial indicators, suggesting a higher likelihood of violence relative to other referrals, with his scores suggesting that he is likely to have future acts of violence relative to others previously charged with violent acts"; Nicholas' score was in the highest "risk bin," which, according to Newring, meant the most likely to engage in future acts of violence. With a score in the highest risk bin, the likelihood of Nicholas obtaining a new criminal charge for an act of violence in the next 5 to 12 years is 80 to 90 percent, "depending on our follow-up timeline."

Newring's report was received into evidence without objection. Newring noted that "Nick's experience of behavioral health disorder adversely impacts his ability to effectively interact with others, such as caseworkers, daycare workers and parents of other children." Newring stated,

> Those working with Nick will find it likely taxing if relaying [sic] on verbal instruction to provide information. Due to his experience of behavioral health disorder, Nick will likely misperceive the intention of others as hostile and malign. He will also experience others as demeaning and disrespectful if their vocabulary exceeds his ability to comprehend and effectively engage in discourse. Nick has a limited vocabulary but is quick to anger and has relied upon his fists to solve his problems. If frustrated, Nick is likely to attempt to use threats and/or his fists again to solve his problems as he lacks the words and emotion regulation to effectively navigate such a difficult situation.

Newring's diagnostic impressions of Nicholas were: "Personality Disorder Not Otherwise Specified, Psychopathic Personality Disorder"; "Antisocial Personality Disorder"; "Schizoaffective Disorder, Bipolar Type"; "Post-Traumatic Stress Disorder"; and "Caffeine Use Disorder." During the termination hearing, Newring was asked if Nicholas had any identified substance use disorders. Newring responded that Nicholas' self-reported use of "liters and liters of Mountain Dew per day" was concerning because

> [c]affeine is a stimulant that works as other stimulants, like methamphetamine and cocaine. It can lead to increased agitation, increased energy, restlessness, paranoia. Those were concerns that that amount of stimulant intake via methamphetamine, Adderall, loads of caffeine -- these are things that happen when we have too much stimulants. And he described to me feelings of distrust of others, paranoia, agitation, restlessness, given the amount of sugar and caffeine he was taking in, that could also be explained by that much stimulant intake. So it's one that I couldn't rule out or cleanly assess given his self-report of how much he was taking in.

Additionally, the caffeine use disorder could potentially pose a problem if Nicholas were prescribed medications to treat his other mental health diagnoses. Newring stated,

> [C]affeine use disorder can show up in a couple of ways. One, it's going to speed up the metabolism typically. So I would want to make sure that if he's given any medication, that the prescribers are making sure that the right amount is sort of getting taken up. If he's taking [medication] and his metabolism is sort of going through them faster than his body needs them, he might not be getting the full benefit of the medication. The other part is, if any of those medications are also stimulating, that could exacerbate or compound the effect. The other consideration is the strain it puts on the organs.

On cross-examination, Newring acknowledged that he did not have access to all of the collateral information, a lot of Nicholas' medical records, or any "CPS records" from the time he was in the child welfare system; those records could "potentially" have impacted Newring's findings, "[e]specially around PTSD and the schizoaffective/bipolar consideration." Newring agreed that

Nicholas did well when he was compliant with his medication although he sometimes required prompts and reminders by his mother or girlfriend.

Newring testified that during his evaluation of Nicholas, Nicholas described his children in loving and affectionate terms, and "he saw himself as good with his kids in small doses" but also "saw that there are times where it was more than he could take on so he needed breaks." According to Newring, both Nicholas and his mother acknowledged that Nicholas could not provide "24/7" care for his children. When asked if he believed Nicholas would be able to engage in independent parenting long term, Newring responded, "Not independently, no." And when asked if he had any concerns about Nicholas' risk of future acts of violence and how that would affect his ability to parent his two children, Newring replied,

> The concerns would be that [Nicholas] would engage in a violent act. Not of the kids but in a way that could expose the kids to a violent act. So a domestic violence type interaction or threatening a case worker, for example. Or if upset or challenged in the community, he could be charged. And if he's in jail, then he's less likely to have time to parent the kids because he's locked up.

On cross-examination, Newring agreed that Nicholas' comments that he could manage his children in small doses indicated a self-awareness of his limitations as a parent and indicated a willingness to ask for help. Newring agreed that Nicholas would be able to parent with structure and supports in place.

In his report, Newring recommended that Nicholas be provided additional resources to help manage his psychiatric and physical health concerns. Newring stated, "As Nick makes progress in self-management in these areas, Nick may be able to suitably parent his small children in small doses provided structure, scaffolding and support as well as the ability to effectively take himself out of situations in which he is emotionally overwhelmed or taxed."

Morgan-Baker testified that Newring recommended that Nicholas obtain a physical, meet with a psychiatrist, and have parenting time with frequent breaks available to him. The physical and psychiatric evaluation were also court-ordered. To her knowledge, Nicholas never completed a physical or a psychiatric evaluation. Morgan-Baker said that Nicholas reported working with Douglas County Mental Health, and later reported that he was going to an outpatient facility for an assessment; releases for information were eventually signed, but Nicholas was no longer receiving services from those agencies when Morgan-Baker requested records. It was her understanding that Nicholas had one visit with a psychiatrist at Douglas County Mental Health, and that he was going to see a psychiatrist at the outpatient facility, but that outpatient appointment did not occur.

Morgan-Baker was concerned that Nicholas never completed a psychiatric evaluation because "[t]here were some pretty serious mental health concerns listed in the psychological evaluation that would require ongoing treatment by a psychiatrist for med management." It was also her understanding that Nicholas has "severe and persistent mental illness and without medication management . . . the symptoms of those diagnoses cannot be managed." On cross-examination, Morgan-Baker acknowledged that Nicholas had been incarcerated since approximately March 2021. She was told by the medical staff at Douglas County Corrections that

they will give medications, but she did not know if Nicholas was participating in medication management during his incarceration because no release of information had been signed.

Morgan-Baker testified that Nicholas was "sporadic with his visits" and only attended 68 percent of his visits with the children; on cross-examination she acknowledged that her calculation included visits missed because of circumstances outside of Nicholas' control, such as "COVID" exposures or a worker being unavailable. She said when the children came into care in December 2019, Nicholas' visitation was suspended because there was a protection order "protecting the children from visiting with [Nicholas]." According to Morgan-Baker, Nicholas' visits resumed in May 2020. When the children did have visits with Nicholas, no safety concerns were noted in the visitation reports, nor were there any behavioral issues with the children. However, "[t]he minute the children were dropped off to day care, the children acted as if they were terrified, up until the foster parent was able to be present with them and to calm them down."

The children's foster mother testified differently than Morgan-Baker about the timing of Nicholas' visits. The foster mother testified that Alma and Liberty have been placed with her since December 2019. Prior to September 2020, Alma and Liberty only had visits with their mother, and behavioral issues, particularly with Alma, occurred after visits. Nicholas did not begin having visits with Alma and Liberty until September, and his visits occurred once a week for 2 hours. Because the children were also having visits with their mother, the behavioral issues could not be attributed specifically to Nicholas' visits. The children did not have visits with either parent from November to mid-December, and Alma's behaviors improved; according to the foster mother, Liberty had been consistent and would "go with the flow." When Nicholas' visits resumed from mid-December to January 2021, Alma started showing signs of aggression, "pinching or pulling hair and not using her words"; she also had issues with toileting accidents. (According to the foster mother, the children also resumed visits with their mother in January.) She said Nicholas' visits were suspended in late January and early February due to the children's regression. Nicholas' visits were supposed to resume in February, once per month, but no visits occurred. Nicholas' visits were ended in March because he was incarcerated.

Kerstin Walpus, a licensed independent mental health practitioner, began working with Alma and Liberty in July 2020, when Alma was 3 years old and Liberty was 2 years old. Walpus saw the girls every week or every other week depending on the situation, but at the time of the termination hearing she was seeing them every other week.

Walpus diagnosed Alma with acute stress disorder, and Liberty with acute stress disorder "NOS." According to Walpus, children with this diagnosis "would exhibit distress when reminded or with a trigger, an event, a sound, a smell, a touch, something that would remind them of something distressful that happened to them before," "[t]hey also would have sleep issues" and "emotional dysregulation issues." The child can also have a regression in developmental milestones, such as learning how to use the bathroom, or may exhibit some behavioral regression, such as acting or talking like a baby when they are above that age. Walpus observed some of these behaviors in Alma.

Walpus stated that from July to September 2020, "Alma would come into my office sometimes, and she would become all of a sudden just aggressive, grabbing, snatching, taking things from others, punching, shoving," and then she would "just all of a sudden just go to the bathroom and -- and then we'd have to run to the potty, so -- and then also she would rest, as in

she wasn't talking as much"; in the beginning, this happened "frequently," every or every other session. Walpus learned from Alma's foster parents that there seemed to be an increase in concerning behaviors when there were more frequent visits with her biological parents; when visits decreased, so did the concerning behaviors. Alma did much better with her coping strategies in September and October.

Walpus stated that from July to September 2020, Liberty's behaviors included "roaming around the room aimlessly, tossing toys while she was doing that, throwing toys at people, sometimes just screeching, outright screeching in my room," and also "literally falling down and crying onto the floor where she was inconsolable"; the behaviors "were pretty intense." Liberty's behaviors also lessened in September and into October. Like with Alma, Liberty's concerning behaviors increased with the frequency of parental visits, but the foster parents helped Liberty use coping strategies to regulate her distress.

Parenting time reports were received into evidence. The reports were for Nicholas' visits with the children from mid-September to the end of October 2020, and mid-December; there were no visits in November because Nicholas "contracted COVID-19." According to the reports, there were no safety concerns, and Alma and Liberty "seemed to really enjoy the time they get to spend with Nicholas" and were "visibly saddened to be leaving their father" at the end of visits.

Walpus learned that the children's visits with their mother ceased while their mother was incarcerated from October 2020 to January 2021. There was an improvement in the children's behavior in October, and since then their regressions have been "[o]ff and on," but not as intense or frequent. In the winter, their behaviors increased suddenly. Nicholas stopped having visits at the end of January, early February 2021. The children's behaviors went "up and down" from February to May; Nicholas did not have visits during those months. Walpus never interacted with Nicholas. She offered services to Nicholas via the caseworker, but the caseworker told her that Nicholas did not want to engage in child-parent psychotherapy.

According to Morgan-Baker, Nicholas had not demonstrated an appreciation or understanding of the children's higher needs. She stated that Liberty has been diagnosed with a generalized anxiety disorder, and Alma has been diagnosed with reactive attachment disorder and a speech delay. The foster mother testified that Alma began speech therapy in February 2021, and those appointments took place over Zoom. Morgan-Baker and the foster mother both testified that Nicholas has not participated in any medical appointments or in any of the speech therapy. On cross-examination, Nicholas' counsel asked, "And he's also never been invited to any medical visits[,] isn't that correct?" Morgan-Baker responded, "He has either been incarcerated or there was a no contact order by this Court for the medical appointments that occurred for the children."

Morgan-Baker testified that Nicholas' visits with the children were terminated by the juvenile court in February 2021. When asked about her understanding of the reason parenting time was terminated, she replied, "The ongoing acts of violence that [Nicholas] was completing and the risk of the safety of the children." Morgan-Baker "believe[d] he was incarcerated again at that time for terroristic threats," but she did not know who the threats were made against.

Morgan-Baker stated that Nicholas never participated in batterer's intervention. She sent a referral for the service to begin, but Nicholas did not follow through. Nicholas' failure to complete batterer's intervention was concerning because "[t]he children came into care due to domestic violence in front of the children between him and the mother of the children," and "[t]here have

been no opportunities for him to engage in any therapeutic services to remedy the situation that made that occur." On cross-examination, Morgan-Baker stated that at the time of an initial referral for batterer's intervention, all classes were on hold due to COVID. She said Nicholas was placed on the waitlist, which was supposed to be opened in August 2020, but "we didn't have any verifiable way to contact [Nicholas] at that time" and because the provider was unable to contact Nicholas, he was put back on the bottom of the waitlist.

Morgan-Baker testified that from December 2019 until May 2021, she had "[i]ntermittent" contact with Nicholas because she was not always able to locate him. She said, "There were times where he stated he was out of the country or I didn't have a valid phone number or a valid address to reach him, or there were times he was incarcerated at Douglas County Corrections and they were not allowing visits due to COVID." When Morgan-Baker did have conversations with Nicholas, they discussed his court orders, his progress on those court orders, any barriers he had to completing those orders, and what assistance he needed to complete his court orders. Nicholas was "[n]ot typically" helpful in his conversations with Morgan-Baker. She said, "He would tell me that I'm not helping him, I'm not doing my job"; "I would ask him how he needed help with that, if he needed phone numbers, and he repeatedly told me that I'm not helping him and not doing my job." She said Nicholas never asked how his children were doing. On cross-examination, Morgan-Baker stated, "[Nicholas] didn't ask me about [the children] and how they were doing. He would tell me how they were doing and what he was expecting of me." However, he was not having visitation with the children during all those conversations.

Morgan-Baker testified that in May 2021, she went to see Nicholas at Douglas County Corrections. While there, Nicholas "made terroristic threats against me, and I ceased all contact after that." When asked what Nicholas said to her at that time, Morgan-Baker replied, "He told me that I was nothing but a target on my back at a shooting range and then alluded to the fact that he would take care of that when he was released." She said, "His speech demonstrated agitation and anger. However, he was sitting in the chair. . . . [H]is body language wasn't showing that he was angry, but his speech patterns were." On cross-examination, Morgan-Baker acknowledged that this incident occurred after a "heated" juvenile court hearing where it came to light that one of the visitation workers had gotten into two separate car accidents with the children; Nicholas was upset to hear that information and expressed to Morgan-Baker his desire to sue DHHS and St. Francis Ministries. Morgan-Baker testified that she reported Nicholas' threats against her to law enforcement. She stated, "The Douglas County Attorney's Office have [sic] notified me that there were charges filed and that [Nicholas] has pled [to attempted terroristic threats] and they are awaiting sentencing." It was her understanding that Nicholas remained incarcerated at the time of the termination hearing. (We note that Nicholas personally appeared at the termination hearing).

Morgan-Baker confirmed that the children have remained out-of-home since December 2019, and she did not believe that Nicholas had addressed the specific issues that caused the removal of his children. According to Morgan-Baker, Nicholas is not a fit parent. She said, "He's been incarcerated multiple times. He has not been consistent with participating in visits. He has not completed any of the court orders other than the ones that I listed earlier." When asked what Nicholas could have done to either develop an aptitude for parental fitness or to demonstrate his own parental fitness, Morgan-Baker replied, "Complete the court orders, refrain from acts that would cause incarceration, participate in therapy with his children, and manage his own mental

health." Morgan-Baker opined that it was in the children's best interests to terminate Nicholas' parental rights because the children had been in care for approximately 20 months and "[w]e are no closer to reunification at this point than when the children were removed due to the father's lack of participation in services."

JUVENILE COURT'S DECISION

In an order entered on November 4, 2021, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Nicholas' parental rights existed pursuant to § 43-292(2) and (6). The court also found that termination of Nicholas' parental rights was in the children's best interests. The court terminated Nicholas' parental rights to Alma and Liberty accordingly.

Nicholas appeals.

ASSIGNMENTS OF ERROR

Nicholas assigns, restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights pursuant to § 43-292(2) and (6), and (2) termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Nicholas parental rights under § 43-292(2) and (6). The juvenile court found both grounds existed by clear and convincing evidence.

Section 43-292(2) provides for termination of parental rights when the parent has substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "'"A parent may as surely neglect a child of whom [he or] she does not have possession by failing to put [himself or] herself in a position to acquire possession as by not properly caring for a child of whom [he or] she does have possession."'" *In re Interest of Elizabeth S.*, 282 Neb. 1015, 1025-26, 809 N.W.2d 495, 504 (2012) (citations omitted) (brackets in original).

Alma and Liberty were removed from the parental home in December 2019 because of a domestic violence incident between their mother and Nicholas; according to Morgan-Baker, the children were present during the incident. Nicholas subsequently pled guilty to domestic assault 3rd degree and was sentenced in April 2020 to 90 days' imprisonment in the Douglas County Correctional Center, with credit for 45 days' time served. The record reflects that in April 2021,

- 10 -

the juvenile court suspended Nicholas' visitation with the children because Nicholas was incarcerated on domestic violence and strangulation charges. Then, in May when Morgan-Baker went to see Nicholas at Douglas County Corrections, he made terroristic threats against her; it was her understanding that charges were filed against Nicholas, he pled to attempted terroristic threats, and he was awaiting sentencing. It was also Morgan-Baker's understanding that Nicholas remained incarcerated at the time of the termination hearing. During these incarcerations, Nicholas was unable to provide care for Alma and Liberty. By his own actions and choices, Nicholas failed to put himself in a position to acquire possession of Alma and Liberty. *In re Interest of Elizabeth S., supra*.

The State has shown clearly and convincingly that § 43-292(2) exists as a statutory basis for terminating the parental rights of Nicholas. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory basis for termination. *In re Interest of Mateo L. et al., supra*.

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, it is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)). We next consider whether termination is in the children's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Nicholas has been in and out of incarceration for acts of violence throughout this case; including making terroristic threats against the caseworker in May 2021. Additionally, Nicholas failed to comply with court orders to participate in and complete domestic violence education to include batterer's intervention, complete a psychiatric evaluation, and participate in

- 11 -

medication management. Morgan-Baker testified that Nicholas was unfit and opined that it was in the children's best interests to terminate his parental rights because the children had been in care for approximately 20 months and "[w]e are no closer to reunification at this point than when the children were removed due to the father's lack of participation in services."

We note that there were no safety concerns during Nicholas' visits with the children, and that the girls appeared to enjoy their visits with him. However, each visit lasted only a couple hours and due to Nicholas' various incarcerations and other issues, visits were intermittent. According to Newring, Nicholas acknowledged he could not provide "24/7" care for his children. Newring did not believe that Nicholas could parent independently and would need structure and supports in place. According to Newring, Nicholas also needed to manage his psychiatric and physical health concerns and stated, "As Nick makes progress in self-management in these areas, Nick may be able to suitably parent his small children in small doses provided structure, scaffolding and support as well as the ability to effectively take himself out of situations in which he is emotionally overwhelmed or taxed." However, Morgan-Baker testified that Nicholas did not complete a psychiatric evaluation or participate in medication management.

The juvenile court found that it was in the best interests of Alma and Liberty that Nicholas' parental rights be terminated. We agree. Alma and Liberty had been out of Nicholas' care for 21 months at the time the termination hearing concluded. The girls deserve permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Nicholas was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Nicholas' parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Nicholas' parental rights to Alma and Liberty.

AFFIRMED.